IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
                                    )
ASSOCIATION OF APARTMENT OWNERS     )
OF IMPERIAL PLAZA,                  )
                                    )
                  Plaintiff,        )
                                    )   Civ. No. 11-00758 ACK-KSC
        vs.                         )
                                    )
FIREMAN'S FUND INSURANCE            )
COMPANY,                            )
                                    )
                  Defendant.        )
                                    )
```

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This case arises from a dispute between an insurance company and the owners of a property as to whether an insurance agreement covers arsenic damage to the property. On December 11, 2011, the Association of Apartment Owners of Imperial Plaza ("Plaintiff" or "Imperial Plaza") filed a Complaint asking for declaratory relief that Fireman's Fund Insurance Company ("Defendant" or "FFIC") must pay benefits to Plaintiff under an insurance policy issued by FFIC.[1/]   ECF No. 1.  On November 28, 2012, Plaintiff filed a Motion for Partial Summary Judgment ("MSJ") and a Concise Statement of Facts ("Plntf.'s CSF) asking for a judgment that the arsenic damage is covered by the

---

[1/] The Complaint also requested attorneys' fees and costs as well as "such other relief as [the Court] may deem just and proper under the circumstances." Complaint at 5, ECF No. 1.

-1-

insurance policy.  ECF No. 23 & 24.  Defendant filed an

opposition on March 4, 2013 ("Def.'s Opp.") along with a Concise

Statement of Facts ("Def.'s CSF").  ECF No. 52 & 53.  Plaintiff

filed a reply on March 11, 2013 ("Plntf.'s Reply").  This Court

held a hearing on March 25, 2013 regarding this matter.

### FACTUAL BACKGROUND

Defendant issued an all-risks insurance policy to

Plaintiff that covered the real property and building located at

725 Kapiolani Blvd., Honolulu, HI ("Building") from the time

period of October 15, 2009 - October 15, 2010 ("Policy").

Plntf.'s CSF Ex. 1 at 967.  Defendant provided substantially

similar coverage to Plaintiff from October 15, 2005 through

October 15, 2012.  Plntf.'s CSF Dec. of John Bouchie at 2 ¶ 6.

The Building was originally a three-story warehouse

with a roof consisting of a cement topping slab.  Plntf.'s CSF

Ex. 2 at IP01151.  A thick layer of insulation was placed on top

of the cement roof slab ("Insulation Layer"), with the roof being

placed upon the Insulation layer.  Id.  The Insulation Layer

consisted of a layer of cork, a layer of canec, and another layer

of cork.  Id.  Canec is a building material unique to Hawai'i.

Plntf.'s CSF Ex. 3 at IP 000370.  It is a fiberboard made out of

sugar cane bagasse and treated with inorganic arsenic compounds

as an anti-termite agent.  Id.

In the 1990's, a fourth floor was constructed on top of the existing third floor roof of the Building.  Plntf.'s CSF Ex. 2 at IP 01151; Ex. 4 at IP01308.  To build the fourth floor, the builders poured a concrete slab upon the entire existing roof assembly of the Building before constructing the fourth floor on top of part of the new slab.  Id.  The builders ran plumbing lines through the third floor roof and Insulation Layer to service the fourth floor.  Plntf.'s CSF Ex. 4 at IP01308.

On February 26, 2003, Miyasato Kuniyoshi Engineers LLC conducted tests of the fourth floor to discover the source of floor deflections.  Plntf.'s CSF Ex. 2 at IP 01151, Def.'s CSF Ex. A, Attachment B at 1-3.  The report found that moisture in the Insulation Layer was decomposing the canec.  Id.  The report also recommended removal of the Insulation Layer and replacement of the floor.  Id.

In 2006, polyurethane gel was injected into the depressed areas of the fourth floor in order to increase stability of the flooring.  Plntf.'s CSF Ex. 2 at IP 01152.  Although a 2006 and 2008 report conducted by Wiss, Janney, Elstner Engineering concluded that the polyurethane gel injections were effective ("WJE Report"), Trinity ERD conducted further tests in 2010 to determine if the Insulation Layer was dry in order to inject additional material to support the concrete floor slab.  Plntf.'s CSF Ex. 3 at IP 00945.

-3-

On or about June 9, 2010, the date of Trinity ERD's report, Plaintiff discovered the presence of arsenic in the fourth floor concrete slab above the Insulation Layer.  Plntf.'s CSF Ex. 3.  Moisture had infiltrated the Insulation Layer and dissolved the canec.  Plntf.'s CSF Ex. 4 at IP 01309, Def.'s CSF Ex. A, Attachment B at Page 2 of 4.  The moisture carried the arsenic in the canec into the cement topping slab above the Insulation Layer.  Plntf.'s CSF Ex. 4 at IP 01309, Def.'s CSF Ex. A at 1.  The concentration of arsenic required abatement because it posed a health risk to the Building occupants.  Plntf.'s CSF Ex. 4 at IP 01310, Def.'s CSF Ex. A at 1 ¶ 4.  Plaintiff reported the arsenic damage claim to Defendant shortly thereafter.  Plntf.'s CSF Dec. Of John Bouchie at 2.

Defendant's consultant, Allana, Buick, and Bers, Inc. ("ABB"), completed an investigation of the damage to the Building and sent a report to Defendant on January 12, 2011.  Def.'s CSF Ex. A.  On February 10, 2011, Defendant sent a letter to Plaintiff denying coverage of the damage under the Policy ("Denial Letter" or "Denial").

Sometime in 2011-2012, Plaintiff remediated the Building, removing the fourth floor concrete slab and the decomposed canec.  Plntf.'s MSJ at 4, Plntf.'s CSF Ex. 4 at IP 01307.  During remediation, Trinity ERD investigated additional potential sources of moisture.  Plntf.'s CSF Ex. 4 at IP 01310.

-4-

As a result of the investigation, the plumbing piping and an air handler were rehabilitated as part of the remedial construction. Id. Defendant did not send a consultant to examine the Building during remediation, although the record reflects that ABB had stated in the January 12, 2011 report to Defendant that the Building should be remediated.  Def. Opp. at 7; Def.'s CSF Ex. A at 2.  Additionally, Plaintiff's engineer consultant, Colin Murphy, communicated to Defendant's consultant, ABB, that Plaintiff would begin remediation and proceed with repairs. Plntf.'s Reply Ex. 7 at 46, 66-67.  Plaintiff did not re-tender the claim to Defendant either during or after remediation. Def.'s CSF at 3 ¶ 6, Dec. of Paul Blanchard at 2.

While the parties agree to the above basic outline of events; they disagree as to the causation of the moisture that resulted in the arsenic damage.  Each party's contentions are explained below.

Plaintiff contends that the moisture came from either (1) a broken domestic water line, (2) a broken waste line, (3) a large package type air handler unit located within the space and adjacent to the low area of the slab, or (4) cracks in the topping slab that could have allowed water into the Insulation Layer.  Plntf.'s CSF at 2 ¶ 5, Dec. of Colin Murphy ¶¶ 4-5, Ex. 4.

Defendant argues that the moisture came from either (1) "leakage in the roof assembly prior to construction of the upper floor" or (2) the exposure of edge conditions at the roof perimeter during the construction of the fourth floor. Def.'s CSF at 3 ¶ 2 (citing Plntf.'s CSF Ex. 3 at IP 00962). Defendant also argues that the floor depressions are likely due to the canec degradation caused by moisture trapped in the Insulation Layer from around 1990-1991. Def.'s CSF Ex. A at 1.

## STANDARD

A party may move for summary judgment on any claim or defense - or part of a claim or defense - under Federal Rule of Civil Procedure ("Rule") 56. Summary judgment "should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Maxwell v. Cnty. of San Diego, 697 F.3d 941, 947 (9th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). Under Rule 56, a "party asserting that a fact cannot be or is genuinely disputed must support the assertion," either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

-6-

The substantive law determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147 (9th Cir. 2012). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (citation omitted).

A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." United States v. Arango, 670 F.3d 988, 992 (9th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380.

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. Avalos v. Baca, 596 F.3d 583, 587 (9th Cir. 2010).[2/]  If the moving party

_____

[2/]  When the party moving for summary judgment would bear the burden of proof at trial, the movant must present evidence which would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. Miller v. Glenn Miller Prods., 454 (continued...)

satisfies its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Sluimer v. Verity, Inc.</u>, 606 F.3d 584, 587 (9th Cir. 2010). The nonmoving party must present evidence of a "genuine issue for trial," Fed. R. Civ. P. 56(e), that is "significantly probative or more than merely colorable."[3/] <u>LVRC Holdings LLC v. Brekka</u>, 581 F.3d 1127, 1137 (9th Cir. 2009) (citation omitted). Summary judgment will be granted against a party who fails to demonstrate facts sufficient to establish "an element essential to that party's case and on which that party will bear the burden of proof at trial." <u>Parth v. Pomona Valley Hosp. Med. Ctr.</u>, 630 F.3d 794, 798-99 (9th Cir. 2010 (citation omitted).

When evaluating a motion for summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment

_____

[2/] (...continued)
F.3d 975, 987 (9th Cir. 2006) (citation omitted). In contrast, when the nonmoving party would bear the burden of proof at trial, the party moving for summary judgment may meet its burden by pointing out the absence of evidence from the nonmoving party. <u>Id.</u> (citation omitted).

[3/]    The Ninth Circuit has noted that "Legal memoranda and oral argument, in the summary-judgment context, are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." <u>Flaherty v. Warehousemen, Garage and Service Station Emp. Local Union No. 334</u>, 574 F.2d 484, 486 n.2 (9th Cir. 1978), <u>see also</u> <u>Barcamerica Intern. USA Trust v. Tyfield Importers</u>, 289 F.3d 589, 593 n.4 (9th Cir. 2002).

motion." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). The court may not, however, weigh conflicting evidence or assess credibility. <u>In re Barboza</u>, 545 F.3d 702, 707 (9th Cir. 2008). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. <u>Anderson</u>, 477 U.S. at 250–51.

**DISCUSSION**

**I.   Whether the Insurance Policy Required Plaintiff to Re-tender the Claim After FFIC Denied Coverage**

Defendant first argues that Plaintiff should be barred from coverage under the Policy because Plaintiff failed to re-tender the claim after "new" potential sources of water infiltration were discovered during remediation as stated in the Supplemental Trinity Report.  <u>See</u> Def.'s Opp. At 5-7.  Defendant specifically alleges that Plaintiff violated the cooperation provision within the Policy, prejudicing Defendant by denying an investigation of the potential water sources that Plaintiff now uses to argue for coverage.[4/]  Def.'s Opp. At 7.  Defendant also argues that the letter sent to Plaintiff on February 11, 2011 that first denied coverage stated that Plaintiff could submit further evidence regarding the loss and the claim.  <u>Id.</u>

---

[4/]   The Policy states that Plaintiff is to permit Defendant to inspect the property and records proving loss or damage as well as to let Defendant take samples of the damage for inspection, testing, and analysis.  Plntf.'s CSF Ex. 1 at IP 01020.

Plaintiff argues that no duty has been breached because Mr. Murphy informed ABB, Defendant's consultant, that Plaintiff had bid out the remediation and would be subsequently conducting repairs.  Plntf.'s Reply at 4.  Defendant completed its report without waiting for repairs to begin.  Plntf.'s Reply at 4. Plaintiff did not receive any other requests from ABB or Defendant to conduct another inspection after the commencement of remediation.  Id.

Generally, an insurer seeking to avoid coverage because of an insured's breach of a cooperation clause must prove "(1) the existence of substantial prejudice and (2) the exercise of reasonable diligence to secure the insured's cooperation before it can deny coverage because of breach of a cooperation clause." Hayes v. United Fire & Cas. Co., 3 S.W.3d 853, 857 (Mo. Ct. App. 1999), Billington v. Interinsurance Exchange of Southern Cal., 71 Cal. 2d 728, 736-38, 744 (1969), Smith v. Nationwide Mut. Ins. Co., 175 Vt. 355, 362-64 (2003), Baghaloo-White v. Allstate Ins. Co., 270 A.D.2d 296, 296 (N.Y. App. Div. 2000), See Continental Cas. Co. v. City of Jacksonville, 550 F. Supp. 2d 1312, 1339-40 (M.D. Fla. 2007).

Moreover, when an insurer denies coverage under a policy, the rule used by a majority of states is that an insurer cannot then require an insured to follow a contractual duty to

cooperate.[5/]  Foreign Credit Corp. v. Aetna Cas. & Sur. Co., 276

F. Supp. 791, 793-94 (S.D. N.Y. 1967) ("A repudiation of

liability by an insurance company excuses the insured from

further performance on his part of the conditions of the

policies."), Davis v. Criterion Ins. Co., 754 P.2d 1331, 1332

(Alaska 1988)("[I]f an insurer has wrongfully denied coverage, it

has materially breached its contractual obligation to the insured

. . . and cannot escape liability on the ground that the insured

failed to comply with other terms of the contract subsequent to

its own breach.") Cf. Samson v. Transamerica Ins. Co., 30 Cal.3d

220, 238 (1981) ("[I]f an insurer denies coverage to the insured,

the insured's contractual obligation to notify the insurer

ceases.").

　　　　The rationale behind this rule is that the insurer

first breached the contract by denying coverage; accordingly, the

insured is no longer bound to cooperate under the agreement.  See

id and Arizona Property and Cas. Ins. Guar. Fund v. Helme, 153

Ariz. 129, 136-38 (1987) ("Any breach, actual or anticipatory . .

. deprives the insured of the security that he has purchased . .

. . when such a breach occurs, the insured is generally held to

be freed from his obligations under the cooperation clause.").

---

　　　　[5/] Defendant's counsel conceded at the hearing on March 25,
2013, that Defendant relies upon the minority rule to argue that
Plaintiff should not receive coverage for failure to re-tender
the claim after Defendant's denial of coverage.

Cf. <u>Samson v. Transamerica Ins. Co.</u>, 30 Cal.3d 220, 241 (1981)
(holding that, once an insurer denies the claim, an insured
breaches no duty under an insurance policy by assigning his claim
against the insurance company to an injured plaintiff).

The Court concludes that Defendant's denial of coverage
constituted a breach that relieved Plaintiff of the contractual
duty to cooperate in this case.  The Hawaiʻi Supreme Court noted
in <u>Best Place, Inc. v. Penn America Ins. Co.</u> that an insured buys
insurance to seek "protection and security from economic
catastrophe." 82 Hawaiʻi 120, 129 (1996).  While the <u>Best Place</u>
case does not provide the Court with guidance as to how the
Hawaiʻi Supreme Court would rule,[6/] the Hawaiʻi court's
understanding of the insured's expectations in an insurance
contract closely aligns with the majority rule cases holding that
an insured is not "fully bound by the cooperation clause" once an
insurer denies coverage.  <u>See Arizona Property and Cas. Ins.</u>

---

[6/]   Plaintiff argues that the Hawaiʻi Supreme Court
indicated it would follow the majority rule by examining in <u>Best</u>
<u>Place</u> "whether an insurer's silence may be interpreted as a
denial of a claim so as to constitute a waiver of a policy's
proof of loss requirement." Plntf.'s Reply at 14.  However,
while the Hawaiʻi Supreme Court found in favor of the plaintiff
on the waiver issue, the court did so on the basis of defendant's
specific conduct instead of concluding that the insurer's silence
constituted a denial justifying the insured's breach of a
contract provision. <u>Best Place</u>, 82 Hawaiʻi at 139-40 (1996).
While <u>Best Place</u> does not provide a clear indication of how the
Hawaiʻi Supreme Court would address the re-tender issue in this
case; as noted above, the majority rule used by the Court in this
case aligns with the Hawaiʻi Supreme Court's understanding of the
purpose of insurance contracts.

Guar. Fund v. Helme, 153 Ariz. 129, 137 (1987).  The rationale behind relieving an insured from the cooperation provision after a denial of coverage is that the denial exposes the insured to the financial insecurity that the insured attempted to avoid by purchasing the policy.  Id at 137-38.  After the security of the policy is removed, the insured should be able to take action to protect its interest.  Id.

The rationale behind the majority rule is particularly applicable here, where Plaintiff needed to quickly remediate and repair the Property to prevent the spread of the arsenic contaminated water instead of waiting for Defendant to decide whether or not to investigate the damage.  See Plntf.'s Reply Ex. 7 at 47-50.  Plaintiff persuasively argues that, if it was in fact still bound by the Policy after Defendant's Denial, Plaintiff was confronted with the difficult position of quickly remediating to prevent further damage or waiting for Defendant to decide whether or not to conduct a further investigation.  See Plntf.'s Reply at 17018 and Plntf.'s MSJ Ex. 1 at IP 01020 ¶ A.4. Because Defendant's Denial made Plaintiff assume the risk of financial insecurity, Plaintiff was free to take action without the constraints of the cooperation clause in the Policy.

Defendant relies upon minority rule cases like First Bank of Turley to argue that "[a] breach of the insured's obligation to give notice of critical post-denial developments

-13-

may modify, excuse or defeat the insurer's performance under the contract." First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland, 928 P.2d 298, 304-305 (1996).  However, the Oklahoma Supreme Court does not address the rationale in the majority rule cases that an insurer's denial of coverage constitutes a breach of the policy that relieves the insured from further cooperation under the contract.  See id at 305.[7]  Additionally, the Turley rule requires Defendant to establish that Plaintiff's notice was insufficient for Defendant to investigate and discover all the facts "relative to its *potential liability*."  See id.  Defendant has not proven that it had insufficient notice to investigate the potential sources of moisture.

Defendant also cites to National Union Fire Ins. Co. of Pittsburgh, Pa v. Cagle for the proposition that an insured "owes the insurer the duty of complying with the contract terms together with a general duty of performance in good faith."  68 F.3d 905 (1995).  However, a closer examination of Cagle indicates that Plaintiff did not breach any duty to inform the

---

[7]    The Turley rule provides that a court must examine the following factors to determine if, after an insurer's denial, an insured's performance of its contractual duty is deficient:  "(1) the initial notice was adequate to put the insurer on notice of potential liability under the policy, (2) the nondisclosed (or later-revealed) facts were so material that they should have been reported, (3) the notice was sufficient for the insurer's investigation and discovery of all the facts relative to its potential liability; and (4) the insurer's reasonable investigation could have uncovered the excluded information."  928 P.2d at 305 (1996).

insurer of new developments during the remediation work.   In

Cagle, the Fifth Circuit examined Louisiana law, which holds

that, "before proving a breach by the insured of the cooperation

clause, the insurer must show a diligent effort to obtain the

information."[8/]  Cagle, 68 F.3d at 912.

     In this case, before Defendant issued the Denial

Letter, Plaintiff's engineer consultant, Colin Murphy, notified

Defendant's consultant, ABB, that Plaintiff would begin

remediation and proceed with repairs.   Plntf.'s Reply Ex. 7 at

46, 66-67.   Defendant could have continued its investigation

during the remediation and repair of the Property, but Defendant

did not do so.   Defendant's evidence of Plaintiff's alleged lack

_____

     [8/]   In Cagle, the defendants insured a business for
director liability.   Cagle, 68 F.3d 905, 906-07.   The business
and director were sued by a former client, but the initial action
in state court was not covered by the insurance policy because
the complaint alleged fraud and intentional tort claims, which
were not covered by the policy.   Id at 907.   However, the parties
entered a settlement agreement where the client agreed to drop
the fraud and intentional tort claims and limit its recovery to
available insurance in exchange for certain concessions from the
director.   Id.   The client amended its claims to eliminate the
fraud and intentional tort claims, which restored coverage under
the policy.   Id.   After litigating the negligence issues in state
court, the director lost, and the client pursued the insurance
company for the sums owed under the judgment.   Id at 908.   The
insurance company alleged bad faith on the part of the business
because the business failed to disclose the terms of the
settlement agreement that resulted in the adjusted complaint.   Id
at 912.   The Fifth Circuit found that the insurer was not
diligent in attempting to obtain the information, and the insured
was not required to furnish information that was not requested by
the insurer.   Id at 912.

of cooperation falls short of the standard in both <u>Turley</u> and <u>Cagle</u>.

Defendant also attempts to use the Denial Letter to argue that Plaintiff should have notified Defendant of the additional evidence of water sources.  Def.'s Opp. at 8.  However, the Denial Letter did not place any duty on Plaintiff to notify Defendant of additional facts uncovered during remediation and repair.  The language in the letter is discretionary:  "If you have further evidence you wish to submit to Associated Indemnity Corporation regarding your loss and claim, please forward it to my attention."  Plntf.'s CSF Ex. 2 at IP 01155.  Plaintiff's decision not to volunteer information after the denial letter does not rise to the level of conduct establishing a breach of the cooperation clause.  In <u>Tran v. State Farm Fire and Cas. Co.</u>, a case upon which Defendant relies, the plaintiff specifically refused the insurer's request to provide information, failed to respond to calls and letters, and failed to attend a scheduled meeting to arrange for the inspection of the premises.  136 Wash.2d 214, 218-19 (1998).  The Washington Supreme Court noted that <u>Tran</u> "was an extreme case, in which the insured stonewalled the insurer's investigation, refusing to help or provide documentation."  <u>Staples v. Allstate Ins. Co.</u>, 295 P.3d 201, 209-210 (2013).

In this case, Plaintiff's actions do not rise to the level of "stonewalling" Defendant's investigation because Plaintiff has not refused a specific request by Defendant for information.  As mentioned above, Plaintiff had notified Defendant's consultant as to the remediation and repair work. Plaintiff also delivered Colin Murphy's files to Defendant upon request including photographs and test results.  Id at 6, 13-14, and 48-49.  Defendant has not provided evidence of Plaintiff's deliberate refusal to comply with any of Defendant's requests.

**II.  Whether Plaintiff Is Entitled to Coverage Under the All-Risk Policy as a Matter of Law.**

**A. Hawaiʻi Law Rules of Construction for Insurance Policies**

Under Hawaiʻi law, "the terms of an insurance policy are to be interpreted according to their plain, ordinary, and accepted sense in common speech, unless it appears from the policy that a different meaning is intended." Great Divide Ins. Co. v. AOAO Maluna Kai Estates, 492 F. Supp. 2d 1216, 1226 (D. Haw. 2007) (citing Dairy Rd. Partners v. Island Ins. Co., Ltd., 92 Hawaiʻi 398, 411 (Haw. 2000).  An insurance contract should be construed "according to the entirety of its terms and conditions as set forth in the policy."  Haw. Rev. Stat. § 431:10-237. Additionally, "courts are to construe insurance policies in

accord with the reasonable expectations of a layperson." Hart v. Ticor Title Ins. Co., 126 Hawai'i 448, 456 (2012).

The Hawai'i Supreme Court has held that, "because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer." Hart, 126 Hawai'i at 456.  "A contract is ambiguous when the terms of the contract are reasonably susceptible to more than one meaning." Airgo, Inc. v. Horizon Cargo Transport, Inc., 66 Haw. 590, 594 (1983).  "Ambiguity exists . . . when the policy 'taken as a whole, is reasonably subject to differing interpretation." Great Divide, 492 F. Supp. 2d at 1227 (citing Oahu Transit Servs., Inc. v. Northfield Ins. Co., 107 Hawai'i 231, 236 n.7 (Haw. 2005).  "If the policy is reasonably subject to differing interpretation, the ambiguity must be resolved against the insurer." Id.

**B. Whether Plaintiff Meets its Burden for Coverage Under the Policy**

Plaintiff has the burden to prove that a loss is covered under the terms of the insurance policy. Sentinel Ins. Co. v. First Ins. Co. Of Hawaii, 76 Hawaii 277, 909 n.13 (Haw. 1994), accord Great Divide Ins. Co., v. AOAO Maluna Kai Estates, 492 F. Supp. 2d 1216, 1227 (D. Haw. 2007).  Once Plaintiff meets

its burden of proving that a loss is covered under the insurance policy, Defendant has the burden of proving facts that bring the claim within an exclusionary clause of the policy.  <u>Sentinel</u>, 76 Hawaii at 914, <u>Great Divide</u>, 492 F. Supp. 2d at 8.

In this case, Plaintiff must demonstrate that the Property covered by the Policy[9/] (1) suffered "direct physical loss or damage," and (2) the loss or damage occurred during the term of the Policy, which covered the Property from October 15, 2009 through October 15, 2010.  <u>See</u> Plntf.'s CSF Ex. 1 at IP 00967, 01004.  Plaintiff argues that direct physical loss occurred in June 2010 because (1) water infiltrated the canec Insulation Layer, (2) the water carried arsenic into the cement topping slab above, and (3) the arsenic concentrated and posed a health risk that required abatement.  Plntf.'s MSJ at 15, Plntf.'s CSF Ex. 4 at IP 01310.

The term "direct physical loss or damage" is not defined in the Policy.  <u>See generally</u>, Plntf.'s CSF Ex. 1. <u>Black's Law Dictionary</u> defines "Damage" as "Loss or injury to a person or property."  <u>Black's Law Dictionary</u> 445 (9th ed. 2009).[10/]  The term "direct loss" is defined as "a loss that

_____

[9/]    The Policy states that it covers the Property at issue in this litigation.  Plntf.'s CSF Ex. 1 at IP 00968.

[10/]    The Hawai'i Supreme Court has used Black's Law Dictionary to interpret terms in an insurance provision; accordingly, the Court will do likewise.  <u>See</u> <u>Hart v. Ticor Title</u>
(continued...)

results immediately and proximately from an event." <u>Black's Law Dictionary</u> 1030 (9th ed. 2009).  While the term "immediate" may be defined differently depending on the context; the Court adopts the following definition:  "Having a direct impact; without an intervening agency."[11/]  <u>Id</u> at 816.  "Physical" means "of or relating to natural or material things."  Merriam-Webster, <u>Webster's Third New International Dictionary</u> 1706 (3rd ed. 2002). "Material" is defined as "[o]f or relating to matter; physical." <u>Black's Law Dictionary</u> 1066 (9th ed. 2009).  Based on these terms, Plaintiff must demonstrate that an event had a direct impact and proximately caused a loss related to the physical matter of the Property.

The concrete slab, carpet, and interior objects are physical matter within the ordinary use of those words.  <u>See</u> <u>Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co.</u>, 114 Cal.Rptr.3d 844, 850 (Cal. Ct. App. 2003).  Accordingly, Plaintiff provides sufficient evidence to meet the first requirement for coverage under the Policy.

---

[10/] (...continued)
<u>Ins. Co.</u>, 126 Hawai'i 448, 457 (2012).

[11/]   While "immediate" may also mean "occurring without delay" or "instant"; Hawai'i Supreme Court cases acknowledge that a loss may result over a longer period of time.  <u>Sentinel Ins. Co. v. First Ins. Co. Of Hawaii</u>, 76 Hawaii 277, 298 (1994). Accordingly, this Court adopts a definition of "immediate" that favors the insured and reflects the Hawai'i Supreme Court's understanding of the term "loss" in the context of insurance policies.  <u>See</u> <u>Hart</u>, 272 P.3d at 1223.

For the second requirement, the arsenic damage was discovered on or about June 9, 2010 and continued to occur as of February 10, 2011.  See Plntf.'s CSF Ex. 2 at IP 01153 ¶ c. Regarding the water leak, Plaintiff argues that the leak "occurred slowly over a number of years before it began to cause the arsenic damage.  Plntf.'s MSJ at 16, Plntf.'s CSF Ex. 4 at IP 01310.  In an occurrence policy like the one before the Court, "the event that triggers potential coverage is the sustaining of actual damage by the complaining party and not the date of the act or omission that caused the damage." Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd., 76 Hawai'i 277, 288 (1994). For some types of injury, the date when the property damage occurs is often difficult or impossible to pinpoint.  Sentinel Ins. Co. v. First Ins. Co. Of Hawaii, 76 Hawaii 277, 297 (1994). The Hawaii Supreme Court identified different theories to determine when damage in fact occurs.  See id.

In this case, Plaintiff argues that the court should apply the "continuous injury" trigger of coverage.  This theory is applied "when an injury process is not a definite, discrete event - for example, where the damage continues progressively over time spanning different insurer's policy terms." Id at 298. "The trigger period begins with the inception of the injury and ends when the injury ceases." Id.  In order to apply the theory, Plaintiff must establish that "(1) some kind of property damage

-21-

occurred during the coverage period, and (2) the property damage

was part of a continuous and indivisible process of injury."

Plaintiff demonstrates that damage to the Property

occurred – namely in the form of water carrying arsenic into the

concrete slab, which resulted in accumulated arsenic that

required abatement.  Plntf.'s CSF Ex. 4 at IP 01310.  Plaintiff

also establishes that the water infiltration occurred

progressively over time as a continuous and indivisible process

of injury.  Id.  See Sentinel, 76 Hawaiʻi at 301 (holding that

continuous injury trigger would apply if insurance company could

not identify with reasonable certainty which damages occurred

during the policy period because the loss caused by water

infiltration into the building progressed continuously).

Defendant argues that Plaintiff should not be covered

by the Policy because Plaintiff failed to notify Defendant of the

"floor deflections and resulting damage" within two years after

Plaintiff noticed this type of damage.  See Def.'s Opp. at 27,

Plntf.'s CSF Ex. 2 at IP 01154 – 55.  Defendant references a

provision in the Policy that states as follows:  "No one may

bring a legal action against us under this Coverage Section

unless . . . The action is brought within 2 years after the date

on which the direct physical loss or damage occurred."  Plntf.'s

CSF Ex. 1 at IP 01017.

However, Plaintiff only argues for coverage of the arsenic damage, which Plaintiff asserts was recently discovered and therefore meets the Policy's requirements for timely reporting of damage.  Plntf.'s MSJ at 5 (noting that damages for floor deflection and cracks in the walls are "not in dispute in this lawsuit").  The Court concludes that Defendant was timely notified of the Plaintiff's claims related to the arsenic damage.

Plaintiff establishes and Defendant does not contest that the presence of arsenic in the concrete topping slab was first discovered on June 9, 2010.  Def.'s CSF at 2 ¶ 4.  The Miyasato Report dated February 26, 2003, the WJE Report dated September 5, 2006, and the WJE Report dated January 31, 2008 do not mention the threat of arsenic contamination.  Def.'s CSF Ex. A, Attachment B, C, and D.  Defendant also does not contest that Plaintiff reported the arsenic damage claim to Defendant shortly after its discovery on June 9, 2010.  Id at ¶ 6.  As noted above, an "occurrence" under an insurance policy happens when a party sustains actual damage as opposed to the date of the act or omission that caused the damage.  Sentinel, 76 Hawaii at 298.  Accordingly, Plaintiff had two years from June 9, 2010 to report the arsenic damage, and Plaintiff did in fact report the damage to Defendant during that time.  Def.'s CSF at 2 ¶ 4 & 6.

III.  **Whether Defendant As a Matter of Law Demonstrates That an Exclusion Applies**

-23-

"An 'all risks' policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an 'all risk' policy will be allowed for all fortuitous losses . . . unless the policy contains a specific provision expressly excluding the loss from coverage." C.H. Leavell & Co. v. Fireman's Fund Ins. Co., 372 F.2d 784, 787 (9th Cir. 1967).  Additionally, unlike a specific peril policy, the insured "does not have to prove that the peril proximately causing his loss was covered by the policy," Strubble v. United Services Auto. Ass'n., 110 Cal. Rptr. 828, 831-32 (Cal. Ct. App. 1973).[12/]  Such a policy "covers All risks save for those risks specifically excluded by the policy." Id.

Instead, the insurer has the burden to prove that the peril that proximately caused the insured's loss is "specifically excluded from the coverage of the policy." Id.  Additionally, the "efficient proximate cause rule" applies "when two or more perils combine in sequence to cause a loss and a *covered peril* is the predominant or efficient cause of the loss." Vision One, LLC v. Philadelphia Indem. Ins. Co., 174 Wash. 2d 501, 520 (Wash. 2012), see Strubble v. United Services Auto. Ass'n., 35 Cal. App. 3d 498, 504 (1973).

---

[12/]   In the absence of Hawaiʻi law or guidance, the Court examines California court decisions because Hawaiʻi courts tend to look to California for precedent on issues that have not yet been addressed in Hawaiʻi.  Great Divide Ins. Co. v. AOAO Maluna Kai Estates, 492 F.Supp.2d 1216, 1227 (D. Haw. 2007).

Furthermore, if the insured raises an exception to an exclusion, the insurer also has the burden of proving that the exception does not apply.  Id at 832, accord Glaviano v. Allstate Ins. Co., CV-99-04484-RSWL, 35 Fed.Appx. 493, 495-96 (9th Cir. 2002).

Accordingly, Defendant has the burden of proving that the peril that caused Plaintiff's loss is specifically excluded from the Policy.  Additionally, Defendant has the burden of showing that an exception to the exclusion does not apply.  If Defendant provides evidence creating a genuine issue of material fact as to whether the peril is specifically covered by an exclusion, then summary judgment in favor of Plaintiff would be inappropriate.  Defendant argues that the Section D.1.f Pollution exclusion ("Pollution Exclusion") and the Section D.3 exclusions ("Category 3 Exclusions") apply to remove Plaintiff's claim from coverage under the Policy.

### A.  Whether a Category 3 Exclusion Applies

Defendant argues that the water infiltration itself was caused by Category 3.a Exclusions such as "gradual deterioration, latent defect, mold, wet rot," or Category 3.i Exclusions of "faulty, inadequate or defective design specifications or construction."  Def.'s Opp. at 12-14.  Accordingly, under Defendant's logic, because an exclusion caused the water

infiltration, the damage caused by the water infiltration is excluded under the Policy as well.

As an initial matter, the Court finds that an issue of material fact exists as to whether the cause of the moisture infiltration is a covered or an excluded peril under the Policy. Plaintiff provides engineering reports stating that the cause of the moisture infiltration may be a covered cause of loss, *i.e.*, the broken water line, broken waste line, or the air package handler.  Plntf.'s CSF at 2 ¶ 5, Dec. of Colin Murphy ¶¶ 4-5, Ex. 4.  Defendant produces evidence that the moisture came from an excluded peril, i.e., construction defects.  Def.'s CSF at 3 ¶ 2 (citing Plntf.'s CSF Ex. 3 at IP 00962).  This Court may not weigh conflicting evidence when considering a motion for summary judgment.  See In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008). For the purposes of this motion, the Court views the evidence in favor of Defendant, who is the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378 (2007).  Accordingly, the Court assumes without deciding that the moisture infiltration originates from an excluded peril.

Even though the Court assumes that the cause of the moisture infiltration is an issue of material fact, Plaintiff's argument is that the Category 3 Exclusions do not apply to the moisture infiltration itself - accordingly, the arsenic damage is covered by the Policy because the moisture infiltration is the

"efficient proximate cause."  Plntf.'s MSJ at 18-19.  In other

words, even if the moisture originates from an excluded peril,

the moisture itself is an included peril.

Plaintiff argues that the water infiltration falls

within an Ensuing Loss Clause attached to the Category 3

Exclusions and that coverage therefore applies.  See Plntf.'s MSJ

at 20-22.  Defendant's three particular Category 3 Exclusions are

listed below, in addition to the Ensuing Loss Clause (see bolded

text):

> 3.  This Coverage Section does not insure against loss,
> damage or expense caused by or resulting from the
> following.  **But if loss or damage from a covered cause
> of loss results, we will pay for that resulting loss or
> damage.**[13]
>
> > a.  Wear and tear, gradual deterioration, inherent
> > vice, latent defect, depletion, erosion,
> > corrosion, mold, wet or dry rot;
> > . . . .
> > d. Settling, cracking, shrinkage, bulging, or
> > expansion of pavements, foundations, walls,
> > floors, roofs or ceilings;
> > . . . .
> > i. Faulty, inadequate or defective:
> > > . . .
> > > (2) Design specifications, workmanship,
> > > repair, construction, renovation, remodeling,
> > > grading compaction;
> > > (3) Materials used in repair, construction,
> > > renovation, or remodeling; or

---

[13]   For examples of ensuing loss clause provisions, see
Harbor Communities, LLC v. Landmark American Ins. Co., Civ. No.
07-14336-CIV, 2008 WL 2986424 at *5-6 (S.D. Fla 2008) ("But if
loss or damage by a Covered Cause of Loss results, we will pay
for that resulting loss or damage."), Swire Pacific Holdings,
Inc. v. Zurich Ins. Co., 845 So.2d 161, 165-66 (2003) (citing
numerous examples of ensuing loss provisions).

> (4) Maintenance of part or all of any property wherever located.

Plntf.'s CSF Ex. 1 at IP 01007 (emphasis added).

The Ensuing Loss Clause "operates to carve out an exception to a policy exclusion." <u>Vision One, LLC v. Philadelphia Indem. Ins. Co.</u>, 276 P.3d 300, 307 (Wash. 2012). "[T]he dispositive question in analyzing ensuing loss clauses is whether the loss that ensues from the excluded event is covered or excluded." <u>Id</u> at 307.  If a series of events take place that result in a loss, damage resulting from an uncovered event will not be covered, but damage resulting from covered events will remain covered.  <u>Id.</u>  Another consideration is whether the peril is "separate from and in addition to the initial excluded peril." <u>Acme Galvanizing Co. v. Fireman's Fund Ins. Co.</u>, 221 Cal.App.3d 170, 180 (Cal. Ct. App. 1990).[14/]  Most examples used by the courts involve construction defects that result in subsequent losses.

---

[14/]  In <u>Acme</u>, a welding defect caused a kettle to rupture, causing molten zinc to escape and resulting in damage to the surrounding equipment.  221 Cal. App. 3d at 174-75.  The court found that the welding defect was a latent defect excluded by the policy.  <u>Id</u> at 179.  Although the policy contained an ensuing loss clause, the court found that the clause did not apply to the molten zinc because it was a "loss directly caused by such peril, not a new hazard or phenomenon." <u>Id</u> at 180.  However, the court noted a hypothetical where the loss would be covered, e.g., if the molten zinc had started a fire or caused an explosion.  <u>Id.</u> The fire or explosion would constitute a new covered peril covered by the ensuing loss clause.  <u>Id.</u>

In <u>Vision One</u>, the plaintiff contracted with a company to pour concrete for a building.  276 P.3d at 302.  A subcontractor was hired to supply the shoring to support the poured concrete slabs.  <u>Id</u> at 302.  As the concrete was poured, the shoring gave way, causing a collapse of the finished first section of the floor as well as the framing, rebar, and newly poured concrete.  <u>Id.</u>  The insurance policy excluded losses caused by faulty workmanship, but the faulty workmanship exclusion had an ensuing loss clause providing coverage for loss or damage from a covered cause of loss.  <u>Id</u> at 303.  The Washington Supreme Court found that the parties contemplated that collapse would be a covered loss under the Policy.  <u>Id</u> at *308.  Accordingly, while the policy excluded losses caused by faulty workmanship, the ensuing loss clause covered the damages caused by the collapse.  <u>Id</u> at 311.

Another case that is more closely analogous to the current case is <u>Boardwalk Condominium Ass'n v. Travelers Indemnity Company of Illinois</u>.  Civ. No. 03cv505 WQH (Wmc), 2007 WL 1989656 (S.D. Cal. 2007).  In <u>Boardwalk</u>, a condominium was damaged when defective design or construction caused inadequate ventilation, which resulted in the build up of condensation.  2007 WL 1989656 at *9.  The condensation caused serious water damage and mold.  <u>Id.</u>  The all-risk insurance policy in <u>Boardwalk</u> had an exclusion for design or construction defect, but the

policy also had an ensuing loss clause.  Id at *8.  The
California district court found that the design defect (an
excluded peril) resulted in condensation (a covered peril).  Id
at *9.  Accordingly, the water damage and mold were covered
because the loss resulted from the included peril of
condensation.  Id.

       In this case, Plaintiff also seeks to obtain coverage
for the peril of moisture infiltration.  Defendant concedes that
"moisture infiltration is not an excluded cause of loss in the
all-risks policy."  Def.'s Opp. at 14.  The question is therefore
whether the moisture infiltration is "separate from and in
addition to the initial excluded peril."  See Acme Galvanizing
Co. v. Fireman's Fund Ins. Co., 221 Cal.App.3d at 180 (Cal. Ct.
App. 1990).  Under the circumstances of this case, the Court
holds that the moisture infiltration is covered by the Policy.

       The moisture is a separate and independent event from
Defendant's identified cause of design defect in constructing the
fourth floor without removing the canec insulation layer.  See
Boardwalk, 2007 WL 1989656 at *9.  The moisture, like the fire
hypothetical in Acme, is a separate agent that caused damage,
even though the design defect may have allowed the agent to
enter.  See Boardwalk, 2007 WL 1989656 at *9 ("[C]ondensation,
while "resulting from" the lack of ventilation, is a new hazard

or phenomenon, separate and independent from lack of ventilation.").

The <u>Winans</u> case cited by Defendant does not convince the Court otherwise.  In <u>Winans</u>, the Ninth Circuit examined the definition of "latent defect."  968 F.2d 884, 886 (9th Cir. 1992).  The plaintiffs in <u>Winans</u> did not argue that there was a separate cause covered by an ensuing loss clause – the only issue was whether the damage to the house fell within the "latent defect" exclusion.  <u>Id.</u>  Accordingly, <u>Winans</u> does not apply to the present issue before the Court.

The <u>Aetna Casualty and Surety Co. v. Yates</u> case cited by Defendants is certainly more applicable to the case before the Court.  In <u>Aetna</u>, insureds sued for coverage for damage to their home caused by rot.  344 F.2d 939, 940 (5th Cir. 1965).  The evidence established that the crawl space under the house had been built with inadequate ventilation.  <u>Id.</u>  The air conditioner chilled the trapped air in the crawl space, causing condensation of moisture and subsequent rotting.  <u>Id.</u>  The Fifth Circuit found that the ensuing loss clause did not cover the damages.  However, <u>Aetna</u> is distinguishable from this case because the policy in <u>Aetna</u> specifically had an exclusion for "dampness of the

atmosphere." Id at 941.  In this case, the Policy does not have an exclusion for moisture infiltration.[15/]  See Def.'s Opp. at 14.

Defendant also argues that allowing Plaintiff to recover for water infiltration would eviscerate the exclusions for rot, "which necessarily involves the contact of water with another material." Def.'s Opp. at 24.  Defendant relies on the Aetna case for this proposition.  See Def.'s Opp. at 25 (citing Aetna, 344 F.2d at 941).  However, the Aetna case made a distinction between rot caused merely by dampness of the atmosphere, which was excluded by the policy, and rot caused by "the direct intrusion of water conveyed by the phrase 'water damage'," which the Fifth Circuit implied would be covered by the policy.[16/]  Id.  In this case, regardless of the source of the water, both parties appear to agree that there was some direct intrusion of water as opposed to mere atmospheric dampness.

---

[15/]  The Court notes that, in this case, Plaintiff and Defendant appear to agree that the moisture came from some outside source, not from humidity or condensation.  Plntf.'s CSF at 2 ¶ 5, Dec. of Colin Murphy ¶¶ 4-5, Ex. 4; Def.'s CSF at 3 ¶ 2 (citing Plntf.'s CSF Ex. 3 at IP 00962).

[16/]  The Fifth Circuit also noted in Aetna that the defendant seemed to concede that the ensuing loss clause would "protect the insured where loss from water damage ensued from an excluded loss, e.g., if a rusty pipe burst or if a rotted wall opened and admitted rain." Aetna, 344 F.2d at 941 (5th Cir. 1965).  The last example of a rotted wall opening and admitting rain seems analogous to the design defect alleged by Defendant in this case (construction defect admitting water), meaning that Aetna's main holding excluding coverage would not apply to this case.

Plntf.'s CSF at 2 ¶ 5, Dec. of Colin Murphy ¶¶ 4-5, Ex. 4; Def.'s CSF at 3 ¶ 2 (citing Plntf.'s CSF Ex. 3 at IP 00962). Accordingly, the Court's interpretation of the ensuing loss clause would not eviscerate the exclusion for wet rot.

**B.   Whether the Pollution Exclusion Applies**

Defendant also argues that the Pollution Exclusion applies to Plaintiff's loss caused by the concentrated arsenic. Def.'s Opp. at 15-16.  Defendant argues that, even if moisture infiltration was the "efficient proximate cause" of the arsenic damage, there would be no coverage because arsenic is a pollutant and there is anti-concurrent causation language in the policy with respect to the Pollution Exclusion.  Def.'s Opp. at 17 - 19. An anti-concurrent causation clause excludes a loss if the loss results "from a combination of covered and excluded perils." Preferred Mutual Ins. Co. v. Meggison, 53 F. Supp. 2d 139, 142 (D. Mass. 1999).  In other words, Defendant argues that the damage is excluded because pollution (an excluded peril) is one of the causes of the loss; accordingly, the damage is not covered even if other covered perils also caused the damage.  Def.'s Opp. at 19.  The Policy states the Pollution Exclusion and the anti-concurrent causation language (see bolded text in ¶ D.1) as follows:

> D. Exclusions
>     1.  This Coverage Section does not insure against loss or damage caused directly or indirectly by any of the following.  **Such loss or damage is excluded regardless**

**of any other cause or event that contributes**
**concurrently or in any sequence to the loss.**
. . .

　　f.  Pollution
　　The actual, alleged or threatened discharge,
　　dispersal, seepage, migration, release or escape
　　of pollutants.  **But, if the same is the direct**
　　**result of a covered cause of loss, we do insure**
　　**direct physical loss or damage to covered property**
　　**caused by the actual contact of the covered**
　　**property with the pollutants**.

Plntf.'s CSF Ex. 1 at IP 01005 ¶ D.1.f.

Assuming arguendo that the arsenic in this case

qualifies as a "pollutant,"[17] Plaintiff still prevails because

the arsenic was caused by a covered cause of loss and therefore

falls within the exception to the Pollution Exclusion.  While the

language in Section D.1 contains anti-concurrent causation

_____

[17] The Court declines to examine whether or not the
pollution exclusion actually applies to the leaching of the
arsenic from the canec.  Such an examination would require this
Court to interpret the meaning of terms like "pollutant" that
have been heavily litigated in state and federal courts
throughout the country.  See Apana v. TIG Ins. Co., 574 F.3d 679,
682 (9th Cir. 2009) (noting that there is "an absolute
fragmentation of authority" regarding the pollution exclusion)
and MacKinnon v. Truck Ins. Exchange, 31 Cal. 4th 635, 641-42
(2003).  The determination of whether or not pollution occurred
in this case would require this Court to predict how the Hawai'i
Supreme Court would interpret the pollution exclusion - a task
that even the Ninth Circuit declined by certifying the question
to the Hawai'i Supreme Court.  See Apana, 574 F.3d at 684.
However, because an exception to the pollution exclusion exists
in this case, the Court need not determine whether the pollution
exclusion actually applies.  The outcome would be the same -
either the exclusion does not apply, and Plaintiff's damage is
covered, or the exclusion does apply, but Plaintiff's damage
falls within the exception and therefore is covered.  Because
Plaintiff would prevail regardless of whether or not the
exclusion applies, the Court need not interpret the pollution
exclusion.

language that would avoid the "efficient proximate cause"
doctrine; Defendant fails to address the specific exception
contained in the Pollution Exclusion - "But, if the same is the
**direct result of a covered cause of loss**, we do insure direct
physical loss or damage to covered property caused by the actual
contact of the covered property with the pollutants."  Plntf.'s
CSF Ex. 1 at IP 01005 ¶ f.  This language contradicts the anti-
concurrent clause language barring coverage regardless of "*any*
other cause or event" by identifying an insured cause that
restores coverage.  Plntf.'s CSF Ex. 1 at IP 01005 ¶ D.1.f
(emphasis added).

       The Hawaiʻi Supreme Court has noted that "because
insurance policies are contracts of adhesion and are premised on
standard forms prepared by the insurer's attorneys, we have long
subscribed to the principle that they must be construed liberally
in favor of the insured and any ambiguities must be resolved
against the insurer." Hart, 126 Hawaiʻi at 456.  Accordingly,
the plain language of the exception to the Pollution Exclusion
that allows coverage for pollution caused by a covered cause of
loss prevails over the anti-concurrent causation clause's
restriction of coverage.  Because the arsenic was directly caused
by the water infiltration - a covered cause of loss as discussed
in Section 3.A above - the direct physical loss or damage caused
by the arsenic is covered by the Policy under the exception to

the Pollution Exclusion.   In conclusion, because Plaintiff has established that the all-risks Policy covers the Property, and because Defendant has not presented a genuine issue of material fact that an exclusion applies to the arsenic damage, the Court concludes that Defendant owes Plaintiff indemnity under the Policy, with the amount of indemnity to be owed to be established at trial.[18]

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, April 9, 2013.



_____
Alan C. Kay
Sr. United States District Judge


Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co., Civ. No. 11-00758 ACK-KSC: ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT.

---

[18] Because Plaintiff appears to admit that "floor deflection and cracks in the walls" are not in dispute in this lawsuit, the amount of damage attributable to the arsenic will likely need to be determined at trial.